AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

Southern District of Florida

FILED by _____ D.C.

MAR 2 4 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| DETRIC D. BUTLER, a/k/a DETRIC RUSSEL | ) | Case No.  11-8089-AEV |
| and | ) | |
| LESTER LAING, a/k/a AMAL LEING | ) | |
| | ) | |
| _____ | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ March 20 - 21, 2011 _____ in the county of _____ Palm Beach _____ in the

_____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. Section 1324(a)(1)(A)(i) | Alien smuggling for pecuniary gain. |
| 8 U.S.C. Section 1324(a)(1)(B)(i) | |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

Douglas S. Johnson, Special Agent, "ICE"
Printed name and title

Sworn to before me and signed in my presence.

Date:  _____ 03/24/2011 _____

_____
Judge's signature

City and state:  _____ WEST PALM BEACH, FLORIDA _____

ANN E. VITUNAC, U.S. MAGISTRATE JUDGE
Printed name and title

AFFIDAVIT OF
SPECIAL AGENT DOUGLAS S. JOHNSON

I, Douglas S. Johnson, first being duly sworn, do hereby depose and state as
follows:

1.      I am a Special Agent with the United States Homeland Security
Investigations (HSI), currently assigned to the Resident Agent in Charge, West
Palm Beach, Florida since June 2007. I was previously employed by the United
States Customs and Border Protection (CBP) as a Marine Interdiction Agent and
as a Deputy Sheriff with the Brevard County Sheriff's Office in Brevard County,
Florida. I have been continuously employed and certified as a state and federal
law enforcement officer since January 1985.

2.      As a Special Agent with the United States Homeland Security
Investigations, my duties and responsibilities include conducting criminal
investigations of individuals and businesses who have violated federal laws,
particularly those laws as found in United States Code, Titles 8, 18, 19, 21 and
31. I have received training covering the Immigration and Nationality Act. I have
obtained experience from numerous investigations involving the importation of
narcotics, alien smuggling, and other violations of Customs and Immigration Law.

3.      This affidavit is based upon my own knowledge as well as
information provided to me by other law enforcement officers.  This affidavit does
not set forth every fact known to me regarding the investigation, but only those
facts necessary to establish probable cause to believe that between Sunday,
March 20, 2011 and Monday March 21, 2011, Detric Demetris BUTLER, a/k/a

Detric RUSSEL, and Lester LAING, a/k/a Amal LEING, did knowingly and intentionally bring and attempt to bring a person(s) known to be an alien into the United States via a marine vessel at a place other than a designated port of entry, or a place designated by the Commissioner, for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(i) and 8 U.S.C. § 1324(a)(1)(B)(i).

4.      On Monday March 21, 2011 at 0108 a.m. the Ocean Ridge Police Department received a 911 emergency call from a subject who reported seeing a boat dropping off a group of suspected migrants in the marina area of the Ocean Inlet Park, located at 6990 North Ocean Boulevard, Ocean Ridge, Palm Beach County, Florida. Officers from the Ocean Ridge Police Department responded to the area along with Palm Beach County deputies. A group of seven migrants were immediately taken into custody and detained for the United States Customs and Border Protection (CBP) Border Patrol. All of the subjects had wet clothing and did not possess the proper documentation to enter or remain in the United States. A short time later, one additional migrant was found hiding in the brush and taken into custody.

5.      Agents from CBP Border Patrol took custody of a total of eight undocumented migrants, including seven Haitians and one Jamaican.  The migrants were transported to the Border Patrol station in Riviera Beach where the subjects were administratively processed as arriving migrants.  The migrants were identified as: Marc Andre ACCILIEN, a Haitian male born May 31, 1974; Rosanna CATY, a Haitian female born January 11, 1965; Enile ESTIVEN, a

Haitian male born December 15, 1975; Emma JEAN, a Haitian male born December 25, 1985; Jerry LIMAGE, a Haitian male born October 13, 1990; Suprius SERVIDIEU, a Haitian male born November 12, 1984; Winston Michael MATTIS, a Jamaican male born October 10, 1963; and Kambell FLORVIL, a Haitian male born October 19, 1996.

6.      During the interview process of the migrants, one of the migrants advised Border Patrol Agent Robert VAZQUEZ that he had paid a fee of $2000 to be brought into the United States by small vessel. The migrant, identified as Jerry LIMAGE, a Haitian male born October 13, 1990, stated that a long skinny white colored boat with two motors had brought the group of migrants from the Bahamas to the United States and told them to jump out of the boat and run upon their arrival in the United States. LIMAGE described the boat operator as being in his mid to early twenties, thin build, short hair, and having, what appeared to be, diamond earrings in both ears. The second subject was described as being in his mid to early twenties, thin build and having short hair with a small pony tail.

7.      During the time the migrants were being processed, at approximately 0925 hours the United States Coast Guard received a report of a 29-foot Scarab vessel, occupied by Bahamian males, in need of assistance near position 26 48.0N and 079 23.0W. This position was approximately 38 miles east of West Palm Beach, Florida. The Coast Guard dispatched a helicopter to the area which located the vessel at approximately 1105 a.m. at position 26 50.5N and 079 25.07W. The helicopter attempted to establish communications but had

negative results and a Coast Guard Cutter was dispatched to the area to provide assistance. The Cutter Bluefin arrived at approximately 1246 hours and began to provide assistance not knowing that the vessel was suspected in a smuggling event. The passengers onboard the vessel identified themselves as Detric Russel, a Bahamian male born December 31, 1982, who claimed to be the operator of the vessel, and Amal LEING, a Bahamian male born December 15, 1984. The subjects stated that they were conducting a sea trial between Freeport, Grand Bahama Island and Great Isaacs, Bahamas when they ran out of fuel. At approximately 1403 hours the Cutter Bluefin took the vessel into tow due to increasing sea conditions, and tried to coordinate rescue efforts with a Bahamian towing company. The vessel did not have or display any registration numbers identifying the registration of the vessel.

8.      At approximately 1500 hours, Border Patrol Agent Robert Vazquez notified the Coast Guard of the description of the vessel that was used during the smuggling event earlier in the day. A short time later, Coast Guard advised that the vessel and occupants of the vessel being assisted by the Bluefin matched the description provided by the Border Patrol. The Border Patrol then notified the Department of Homeland Security Investigations (HSI) of the developments. Your Affiant responded to the Border Patrol station and assumed investigative responsibility for the incident. Border Patrol Agent Vazquez briefed your Affiant of the details of the investigation up to this point. The U.S. Coast Guard later provided photographs of the two subjects and the suspect vessel.

9.      Your Affiant assembled two separate photographic arrays that consisted of a total of six photographs. Each of the subject's photographs obtained from the Coast Guard was placed into a different array with five other random photographs of people who were similar in appearance. Additionally a random photograph of a vessel that appeared to be similar to the suspect vessel was obtained to be shown in conjunction with the actual vessel.

10.     Your Affiant then conducted interviews of the migrants. The following is a synopsis of the interviews and is not verbatim:

11.     Jerry LIMAGE declined the use of a translator and stated that he can read, write and understand the English language. He admitted that he was a Haitian National and did not have the proper paperwork or permission to enter the United States legally. LIMAGE stated that he departed Haiti approximately two weeks ago on a large vessel with approximately thirty-five other Haitians. He stated that the vessel took them to an unidentified island in the Bahamas where they were all separated and taken to different locations. LIMAGE stated that he was told to stay in an old abandoned house on a canal with another Haitian subject and that somebody would be by to pick them up later. The person who took him to the house later returned with food and told him that he would be departing in a couple of days. LIMAGE stated that the subject then told him that he needed to pay two hundred dollars in advance to purchase fuel for trip to the United States. He stated that he never saw the subject again.

12.     LIMAGE stated that on Sunday afternoon, March 20, 2011, a long skinny white boat operated by two other subjects pulled up to sea wall behind the

house and told him that it was time to go. LIMAGE stated that the operator of the vessel was a Bahamian black male who appeared to be in his mid to early twenties with short close cut hair. The second subject was also described as a Bahamian black male in his mid to early twenties with slightly longer hair and a pony tail. LIMAGE stated that the vessel was white in color, long and skinny with a pointed bow and two white colored motors. He described the vessel as having a center console and a small cabin in the front. LIMAGE further stated that the vessel did not have any type of top or cover. The vessel entered the ocean and drove along the coast line for a period of time before pulling up to a small canal. At that time he was told to get out of the boat and walk over to a white colored truck that had several people gathered around. LIMAGE stated that he was told that he had to pay another Bahamian male two thousand dollars for the boat trip to the United States. He paid the money to the unidentified subject and then observed others paying the same subject. By this time it was getting dark and they were all told to get back on the vessel. LIMAGE stated that eight people got onto the vessel with the same two vessel operators and they started heading out to sea. LIMAGE stated that the seas were very rough and at one point a large wave hit the boat and broke the windshield. LIMAGE stated that pieces of the windshield hit him and caused minor cuts and lacerations on his arms. He further stated that part of the windshield hit the boat driver in the face causing a cut near his mouth. During the voyage, LIMAGE stated that the only light on the vessel came from what appeared to be a small television screen that the boat driver was looking at which told him which way to steer the boat. LIMAGE described the

image as showing the vessel and which way to go and stated that it was very similar to a device he has seen in cars that tell you where to go. LIMAGE stated that there were a couple of fuel drums in the rear of the boat and that the subject with the pony tail was tending to the fuel and motors. LIMAGE stated that it took them several hours before they arrived on the Florida coast line and they all became very excited when they saw the lights and pulled into a canal and approached a docking area. LIMAGE stated that the vessel did not pull all of the way up to the dock and they were all told to jump out of the boat and to run. He jumped into the water which was waist deep and walked to the shoreline. When all eight of the passengers got to shore the boat took off and disappeared into the ocean and they all ran and hid in the bushes. LIAMGE stated that a few minutes later the police arrived and stopped them. LIMAGE indicated that he could positively identify photographs of the subjects and vessel.

13.    Your Affiant showed LIMAGE one of the photographic arrays and he immediately picked out a photograph of one of the subjects and stated that "this is the boat driver" who got his face cut. Upon showing the second photographic array he immediately pointed out the second subject and stated "this was the other guy" who was in the back of the boat with the pony tail in his hair. Your Affiant had LIMAGE circle and sign the photographs indicating the subjects he identified as the vessel operators. I then showed LIMAGE two separate photographs of similar vessels to which he immediately identified the picture of the suspect vessel provided by the U.S. Coast Guard.

14.    Emma JEAN stated the he could understand and speak the English language but was in need of some assistance with translation. When attempts to contact a Creole translator met with negative results the subject Jerry LIMAGE volunteered to translate as needed. LIMAGE was instructed only repeat what your Affiant said and nothing else. JEAN indicated that he was from Haiti and that he had to pay one thousand Haitian dollars and three hundred U.S. dollars to take the trip from the Bahamas to the United States. The money was paid to an unidentified person in the Bahamas. He stated that the boat was white in color, long and skinny and had two engines. When he was shown the first photographic array he was not able to positively identify anyone. Upon seeing the second photographic array he identified the subject who he described as the assistant who sat in the back of the boat with the pony tail in his hair. Upon showing JEAN the two photographs of similar vessels, he identified the picture of the suspect vessel provided by the U.S. Coast Guard.

15.    Rosanna CATY stated she did not speak or understand the English language and was in need of assistance with translation. When attempts to contact a Creole translator met with negative results the subject Jerry LIMAGE volunteered to translate. CATY stated she was from Haiti and that an unknown amount of money was paid to somebody in Haiti to arrange the trip for her. When shown the different photographic arrays, she was unable to identify either subject. When shown the two different photographs of the vessel, she identified the photograph of the vessel provided by the U.S. Coast Guard and stated that she was sitting in front of the windshield when it broke.

16.     Additional interviews were conducted with all of the remaining migrants except for the juvenile, Kambell FLORVIL who had been transported to another location due to his age. The remaining migrants all indicated that they were all foreign nationals had to pay a fee for the voyage to the United States. None of the remaining subjects could identify the boat operators or vessel.

17.     Upon completion of the interviews your Affiant notified the United States Coast Guard that the occupants and vessel had been positively identified as being the people and vessel used to facilitate the smuggling event. Your Affiant further advised that additional investigation was needed and requested that the occupants and vessel be brought to the United States for further investigation. After a statement of no objection was received from the Bahamian government and concurrence was granted by all U.S. entities involved, it was determined that the subjects and vessel would be paroled into the United States for the purpose of furthering the investigation.

18.     On Tuesday March 23, 2011 at approximately 1145 hours, the U.S. Coast Guard brought the two Bahamian subjects and the vessel to the Coast Guard Station in Riviera Beach, Florida and turned the subjects over to Customs and Border Protection to be paroled into the United States for investigations. The subjects identified themselves as Detric RUSSEL, a Bahamian male born December 31, 1982 and Lester LAING, a Bahamian male born February 08, 1986. The subject RUSSEL had short hair with a small three to four inch pony tail and the subject LAING had a noticeable cut on his upper lip.

19. After being paroled by CBP your Affiant then conducted an interview with the subject identified as Detric Demetris RUSSEL. HSI Special Agents Garry Saxton and Francisco Quinones were present along with Border Patrol Agent Robert Vazquez. RUSSEL was read his Miranda Rights from an agency approved form to which RUSSEL indicated that he understood his rights and agreed to speak with your Affiant. Your Affiant had RUSSEL initial each of the rights on the form and sign his name to indicate he was willing to speak without an attorney being present. The following is a synopsis of the interview and is not verbatim:

20. RUSSEL initially stated that he and his cousin Lester LAING were conducting a sea trial on the vessel Sunday afternoon March 20th when they ran out of fuel. They drifted over night until they flagged down a vessel which gave them food and water and notified the Coast Guard to provide assistance. RUSSEL indicated that he is a well established boat operator and had been operating vessels in the Bahamas for several years. He indicated that he has extensive knowledge of navigation and does not need a GPS to show him where to go. He indicated that he knows the mechanical workings of the engines and does his own repair work.

21. When confronted with the statements and identification made by the migrants, RUSSEL denied any involvement. As the interview continued, RUSSEL admitted that his real name was Detric Demetris BUTLER and not RUSSEL. He stated that he didn't want anyone to know his real name in case the incident was publicized. He then admitted that his cousin Lester LANING had

promised to pay him an undetermined amount of money if he went on the boat and helped him take a group of people to the United States. They thought they had enough fuel to make the trip and had additional fuel drums in the back of the vessel. BUTLER stated that they drove the boat to the area of Eight Mile Rock on the West End of Grand Bahama Island and picked up a group of people. He stated that he did not know where they came from but he knew that they were Haitians. BUTLER stated that he did not ask if they had the proper paperwork or documentation to enter the United States. He indicated that the seas were very rough and that he and LAING took turns driving the vessel. Upon arrival in the United States he stated that all of the migrants jumped out of the boat and made it to shore before they started heading back to the Bahamas. He indicated that just after sunrise on Monday March 21 the vessel ran out of fuel about twenty miles from the West End of Grand Bahama Island. BUTLER stated that they had used all of the extra fuel that was in the fuel drums and had thrown the empty drums overboard after they were used.

22.     Your Affiant then asked BUTLER if he was willing to put his statement in writing. BUTLER agreed but did not know how to write the statement. Your Affiant asked if he wanted your Affiant to write it out and BUTLER agreed. Your Affiant wrote the statement of facts provided by BUTLER to which BUTLER read and agreed on the facts and initialed each statement. He then signed the statement acknowledging that it was true and accurate.

23.     Your Affiant then conducted an interview with the subject identified as Lester LAING. HSI Special Agents Garry Saxton and Francisco Quinones

were present along with Border Patrol Agent Robert Vazquez. LAING was read his Miranda Rights from an agency approved form to which LAING indicated that he understood his rights and agreed to speak with your Affiant. Your Affiant had LAING initial each of the rights on the form and sign his name to indicate he was willing to speak without an attorney being present. The following is a synopsis of the interview and is not verbatim:

24.     LAING stated that he and his cousin BUTLER had borrowed the boat from a friend and were working on the engines. They were conducting a sea trial on the vessel Sunday afternoon March 20th when they ran out of fuel. They drifted over night until they flagged down a vessel which gave them food and water and notified the Coast Guard to provide assistance. LAING indicated that he was a good vessel operator but used a GPS to aide in navigation. When asked about why he and his cousin initially gave false names to the Coast Guard, he indicated that they did not want their true names given out if the incident was going to be broadcast on television or news papers. When asked about the cut above his lip, LAING indicated that he had fallen on the boat during the night but did not need any medical attention. Your Affiant took close up photographs of the cut. When asked about the how the windshield was broken on the vessel, LAING stated that they hit something while launching the vessel the day before.

25.     During the interview your Affiant inquired about the ownership three cellular telephones and the GPS on the vessel. LAING indicated that the cellular telephones belonged to him and his girl friend and that the GPS was borrowed

from another person. Your Affiant requested Consent to Search of the items and a signed waived obtained from LAING.

26.     When confronted about the statements and identification made by the migrants, LAING denied any involvement. As the interview continued LAING continued to deny any involvement and stated that he thought that the statements were made up and not true. LAING later invoked his right to counsel.

27.     After the interviews, both subjects were turned back over to CBP officers who had the subjects held on administrative immigration violations.

28.     While your Affiant was conducting the interviews, HSI Special Agents David Malone and Brian Stafford took detailed photographs of vessel and took possession of the cellular telephones and GPS for forensic examination. The vessel was estimated to be approximately twenty-nine feet in length and was white in color. It was powered by two white colored Johnson outboard motors and had a center console with a small forward cuddy cabin. The windshield on the vessel was broken and had jagged edges. There was only one life jacket on the vessel which the Coast Guard has placed on one of the operators when taken from the vessel. There was no other required life saving or safety equipment (flares, life jackets, sound making device, fire extinguisher) on the vessel. The only identifying mark on the vessel was a Hull Identification Number WEL26012B596. It was reported that the HIN appeared to have been altered or changed in some manner.

29.     WHEREFORE, on the basis of the foregoing facts and evidence, your affiant submits that there is probable cause to believe that between Sunday

March 20, 2011 and Monday March 21, 2011, Detric Demetris BUTLER, aka Detric RUSSEL and Lester LAING, aka Amal LEING, did knowingly and intentionally bring and attempt to bring a person(s) known to be an alien into the United States via a marine vessel at a place other than a designated port of entry, or a place designated by the Commissioner, for the purpose of commercial advantage and private financial gain, in violation of  8 U.S.C. § 1324(a)(1)(A)(i) and 8 U.S.C. § 1324(a)(1)(B)(i).

FURTHER YOUR AFFIANT SAYETH NAUGHT,

Douglas S. Johnson, Special Agent
Homeland Security Investigations


SWORN TO AND SUBSCRIBED BEFORE
ME THIS 25th DAY OF March, 2011, AT
WEST PALM BEACH, FLORIDA.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No.   11-8089-AEV

UNITED STATES OF AMERICA

vs.

DETRIC D. BUTLER, a/k/a DETRIC RUSSEL
and
LESTER LAING, a/k/a AMAL LEING

Defendants.
_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  __X__ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY:  _____
RINKU TRIBUIANI
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.: 0150990
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
TEL:  (561) 820-8711
FAX: (561) 820-8777
Email: Rinku.Tribuiani@usdoj.gov